**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LINDA TINDAL,

              Plaintiff,

vs.                                            CASE NO. 3:06-cv-1095-J-TEM

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

              Defendant.

_____

## ORDER AND OPINION

      This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income payments ("SSI"). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

      The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations.

      Accordingly, the instant matter has been decided on the written record. For the reasons set out herein, **the Commissioner's decision is AFFIRMED**.

_____

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25, Federal Rules of Civil Procedure, Michael J. Astrue is substituted as Defendant herein.

## I. Procedural History

Plaintiff was previously found disabled on February 22, 1996  due to an L4-5 disc herniation (Tr. 20).  Approximately five years later, after a continuing disability review ("CDR"), the Social Security Administration ("SSA") determined Plaintiff's disability had ceased and notified her by written notice dated February 26, 2001 (Tr. 20).  Plaintiff did not appeal the SSA's February 26, 2001 termination of benefits (Tr. 20).

On June 1, 2001, Plaintiff filed new applications for DIB and SSI (Tr. 19) alleging a disability onset date of May 1, 2001 due to chronic lower back pain (Tr. 20).  A hearing was held on November 7, 2003 before Administrative Law Judge ("ALJ") Linda R. Haack, at which, Plaintiff appeared and testified (Tr. 363-91).  On November 24, 2004, the ALJ issued an unfavorable decision and the Appeals Council subsequently denied review (Tr. 4-7, 16-30).

On December 14, 2006, Plaintiff filed a complaint in the United States District Court for the Middle District of Florida appealing the decision of the ALJ (Doc. #1).  Plaintiff now seeks the Court's review of the ALJ's unfavorable decision (Doc. #1).

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).

For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for disability benefits are identical to those governing a claim for

supplemental security income benefits. *Patterson v. Bowen*, 799 F.2d 1455, 1456, n. 1 (11th Cir. 1986). The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. §§ 404.1520(a)(4)(i-v); 416.920(a)(4)(i-v);[2] *Crayton v. Callahan*, 120 F. 3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole,

---

[2]All references made to 20 C.F.R. will be to the 2007 edition unless otherwise specified.

taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so.  While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments.  *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. §§ 404.704; 416.912(c).

### III. Background Facts

Plaintiff was born on July 21, 1955 (Tr. 73). Plaintiff graduated high school through regular classes and has sixteen years of past work experience as a "head stock clerk" (supervising two people) and cashier at Eckerd Drugs pharmacy ("Eckerd's") (Doc. #12 at 2; Tr. 121-22).

In 1993, Plaintiff injured her back while working at Eckerd's (Doc. #12 at 2). An MRI taken in November 1993 showed a L4-5 disc herniation (Doc. #12 at 2). Plaintiff filed a claim for disability due to the aforementioned injury and was found disabled on February 22, 1996 (Tr. 20).

Approximately five years later, the SSA reevaluated Plaintiff's condition. On January 15, 2001, upon request of the state agency, Timothy J. McCormick, D.O. ("Dr. McCormick") evaluated Plaintiff (Tr. 230-33). Dr. McCormick noted that "poor effort was given throughout the examination" and that he was "unable to assess [Plaintiff's range of motion] when supine [because] she gave active resistance to any motion of her legs, inconsistent with motor testing effort when seated." (Tr. 231-32). Dr. McCormick additionally noted Plaintiff's strength was full in all muscle groups (although her effort was poor) and that "[n]o objective finding could be discerned in this examination which would indicate limitations in her functional ability." (Tr. 232).

Accordingly, the SSA determined Plaintiff's disability had ceased (Tr. 20). The SSA notified Plaintiff that her benefits had been terminated by letter dated February 26, 2001 (Tr. 20). Plaintiff never appealed the SSA's termination decision (Tr. 20).

In April 2001, Thomas R. Murrary, M.D. ("Dr. Murrary") noted Plaintiff suffered from myofascial pain syndrom and chronic back pain (Tr. 184-87).  Dr. Murrary prescribed Plaintiff Paxil, Zanaflex, and Zoloft (Tr. 185).  At a follow-up visit in August 2001, Dr. Murrary prescribed Plaintiff Celebrex and Lortab (Tr. 184).[3]   On August 24, 2001, a state agency medical consultant reviewed Plaintiff's medical records and examining source notes and determined Plaintiff had the residual functional capacity ("RFC") to stand or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday (Tr. 177-82).

In October 2001, Plaintiff was examined by orthopedist Earl M. Hales, M.D. ("Dr. Hales") who stated Plaintiff's "motor function when encouraged is 5/5 throughout in her bilateral lower extremities with a possible exception of her bilateral first toe extensors which are at least 4/5 and occasionally 5/5 when encouraged strongly."  (Tr. 200).  Dr. Hales diagnosed Plaintiff with chronic low-back pain and recommended that she continue with her usual medications (Celebrex, Paxil, and Lortab) and obtain a lumbar spine MRI (Tr. 201).

On October 20, 2001, x-rays taken of Plaintiff's lumbar spine were read by Derek Hamlin, M.D. ("Dr. Hamlin") (Tr. 247).  Dr. Hamlin stated Plaintiff's x-rays showed "negative lumbrosacral spine series" and that "[m]ultiple views of the lumbrosacral spine demonstrate normal AP and lateral alignment. . . .  The vertebral bodies are normal in height; no significant disc space narrowing.  No other definite abnormalities are identified."  (Tr. 247).

On November 2, 2001 an MRI taken of Plaintiff's lumbar spine was normal in all respects (*see* Tr. 246).  The radiology report states:

_____

[3] Nothing in the record indicates Plaintiff sought any additional treatment from Dr. Murrary after the August 2001 visit.

6

> Lumbar spine alignment is anatomic.  Vertebral body and intervertebral disc height and signal characteristics are preserved.  Neither mass, fracture nor paraspinal abnormality is seen.  The conus medullaris is normal in position and the nerve roots of the cauda equina are evenly dispersed in the subarachnoid space.  Neural foramina are patent.  No masses or disc herniations are seen.

(Tr. 246).

On November 8, 2001, Plaintiff saw orthopedist, Sunday Ero, M.D. ("Dr. Ero") (Tr. 264).  Dr. Ero reviewed Plaintiff's November 2, 2001 MRI results and examined Plaintiff (Tr. 264).  Dr. Ero's impression was that Plaintiff suffered from chronic back pain (Tr. 264).  Dr. Ero "suggested to [Plaintiff] strongly that she think about going back to work," and encouraged Plaintiff to begin exercising (Tr. 264).  Upon Plaintiff's request at a follow-up visit in February 2002, Dr. Ero referred Plaintiff to the pain management clinic to receive epidural injections (Tr. 261).

In the later part of 2001 and throughout 2002, Plaintiff sought emergency treatment for her lower back pain; however, Plaintiff was never hospitalized (Tr. 248-66).  One Physician at Shands Jacksonville Emergency Department noted on February 26, 2002 Plaintiff experienced chronic back pain and opiate dependence (Tr. 260).

In April 2003, upon referral of her representative, Plaintiff underwent a psychological evaluation by Philip R. Yates, Ph.D. ("Dr. Yates") (Tr. 274-77).  Dr. Yates noted Plaintiff had no difficulty expressing herself and that her speech was clear and focused (Tr. 276).  Dr. Yates further noted Plaintiff was alert, responsive, and quick in responding to questions (Tr. 276).  Dr. Yates stated:

> There was no indication of problems with [Plaintiff's] focus, attention, concentration, or formulating and expressing her feelings and ideas.  She did not demonstrate any depression, anxiety, or emotional discomfort during the evaluation.  She was, to the contrary, an individual who seemed quite well-

7

> contained and as I have mentioned, appropriately responsive, showing good
> eye contact and a generally efficient demeanor.

(Tr. 276).

Dr. Yates administered the Minnesota Multiphasic Personality Inventory-2 ("MMPI-

2") and found Plaintiff's personality was:

> Compatible with an individual who is quite likely to engage in attention-
> seeking behavior and one who has persistent somatic concerns.  Such
> individuals will frequently express emotional needs in the form of somatic
> symptoms and show hypochondriacal tendencies. . . . [. . .] Such individuals
> usually find their pain to be highly reinforcing due to the secondary gain
> obtained.

(Tr. 275).

In August 2003, upon referral of the ALJ, Plaintiff underwent a psychological

evaluation by Peter Knox, M.Ed., Psy.D. ("Dr. Knox") (Tr. 278-91).  Dr. Knox administered

to Plaintiff the Wechsler Adult Intelligence Scale–Third Edition ("WAIS-III") test and

Plaintiff's full scale intelligence quotient ("I.Q.") score was 62, which placed Plaintiff in the

extremely low range of intellectual functioning (Tr. 280-85).  Dr. Knox added a malingering

component to her testing, which showed Plaintiff was likely not malingering during the test

(Tr. 280, 285).

Additionally, Dr. Knox administered to Plaintiff the Woodcock-Johnson Test of

Achievement–Revised ("WJTA"), which showed Plaintiff had good reading skills and

borderline math and written language skills (Tr. 285-86).   Personality testing showed

Plaintiff had hypochondrial symptoms and schizoid personality traits (Tr. 286-89).  Dr. Knox

diagnosed Plaintiff with borderline I.Q., schizoid personality traits, somatization disorder

(prominent hypochondrial features), and assigned Plaintiff a Global Assessment of

Functioning ("GAF") score of 60 (Tr. 289).[4]

Dr. Knox additionally filled out a supplemental questionnaire concerning Plaintiff's ability to do work-related activity, in which, he stated Plaintiff had no limitation in her ability to understand, remember, or carry out simple instructions, and only a slight limitation in her ability to understand, remember, or carry out detailed instructions (Tr. 290).  Dr. Knox based his aforementioned findings on the results of Plaintiff's I.Q. and achievement testing (Tr. 290).  Dr. Knox further stated Plaintiff had moderate limitation in her ability to interact appropriately with the public, co-workers and supervisors, and moderate limitation in responding to work related pressures (Tr. 291).  Dr. Knox based his foregoing findings on Plaintiff's schizoid personality traits (Tr. 291).

In August 2003, at the request of the ALJ, Plaintiff saw neurologist James G. T. Nealis, M.D. ("Dr. Nealis") (Tr. 292-98).  Dr. Nealis stated he was unable to assess Plaintiff's range of motion because Plaintiff gave "active resistance to any movement of her legs due to arouse of pain" (Tr. 293).  Dr. Nealis diagnosed Plaintiff with chronic low back pain and stated that her neurological examination was essentially normal (Tr. 294).  Dr. Nealis additionally stated Plaintiff could stand or walk for less than two hours in an eight-hour workday and that, in regards to sitting, Plaintiff must periodically alternate between

---

[4] The Global Assessment of Functioning Scale (GAF) was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale of 0-100.  A GAF score of 41-50 describes "serious symptoms" and includes "serious impairment in the social, occupational or school functioning."  A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning.  A GAF score of 61-70 indicates "some mild symptoms," but generally functioning "pretty well, has some meaningful interpersonal relationships."  A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 32-34 (4th ed., American Psychiatric Assoc. 2000).

siting and standing to relieve pain and discomfort (Tr. 295-96).

On September 2, 2003, Plaintiff requested that Marcia Funderburk, M.D. ("Dr. Funderburk") fax a letter to the Clerk of Court, in response to a jury summons, because she "does not sit for prolonged periods" due to lower back pain and a herniated disc (Tr. 309). Ostensibly, Dr. Funderburk faxed the aforementioned letter to the Clerk of Court.   In February and April 2004, Plaintiff received trigger point and epidural injections from the pain management clinic (Tr. 321-24).

At the November 7, 2003 hearing, Plaintiff testified that she lives alone and that she does not cook her own meals or do housework (Tr. 378).  Plaintiff further testified that she mostly eats takeout food and that her church supports her (Tr. 369, 378).  When asked what she did during the day, Plaintiff responded that she just lays around on the sofa (Tr. 377, 381).  Plaintiff additionally stated that she can only sit for five to ten minutes at a time and that she can only stand for five to ten minutes at a time (Tr. 374).  Plaintiff also testified that she elevates her legs "every other, every day" for two to three hours and that she is able to keep her mind on task (Tr. 375, 381).

Vocational Expert ("VE") Donna Mancini testified that Plaintiff's past work experience as a retail cashier is considered semi-skilled light work and that her past position as a stock clerk is considered semi-skilled heavy work, as defined by the *Dictionary of Occupational Titles* ("DOT") (Tr. 386).  The ALJ asked the VE if a hypothetical individual with Plaintiff's RFC could perform any jobs in the local and national economy, to which, the VE responded in the affirmative (Tr. 387-88).  The ALJ's hypothetical individual was limited to lifting up to ten pounds, not including ten, had the ability to sit for eight hours in an eight-hour day (alternating positions but standing no more than two hours), had the ability to occasionally

10

perform postural activities, had a moderate limitation interacting appropriately with the public, co-workers, and supervisors, and had a slight limitation on understanding and remembering detailed instructions (Tr. 387).

After considering the ALJ's hypothetical individual, the VE stated jobs existed in significant numbers in the local and national economy that the hypothetical individual could perform despite the aforementioned limitations (Tr. 388).   Some of the jobs the VE mentioned included: (1) order clerk (food and beverage); (2) surveillance system monitor; and (3) parimutuel ticket taker (Tr. 388).   *See* 1 United States Dep't of Labor, *Dictionary of Occupational Titles* §§ 209.567-014; 379.367-010; 219.587-010 (4th Ed. 1991).

In June 2004, approximately eight months after Plaintiff's hearing, Plaintiff saw Christopher R. Goll, M.D. ("Dr. Goll") (Tr. 318-20).[5]  Dr. Goll reviewed Plaintiff's most recent May 13, 2004 CT scan and stated: "[the results show] normal cervical spine alignment with slightly decreased cervical lordosis. [Plaintiff] has mild degenerative changes consistent with her age.   Essentially a normal CT scan" (Tr. 319).   Dr. Goll further reviewed and compared Plaintiff's past MRIs.  Specifically, Dr. Goll noted Plaintiff's November 19, 1993 MRI showed a herniation of Plaintiff's L4-5 with no compression of the nerve roots, and that Plaintiff's November 2, 2001 MRI was "normal in all respects" (Tr. 319; *see also* Tr. 246).

Dr. Goll's overall impression after comparing the aforementioned MRIs was:

> Early MRI following the 1992 injury [the November 19, 1993 MRI] showed that she [Plaintiff] had a likely disc herniation.  The natural history of this condition is that it [would] likely be resorbed, which appears to have happened in Ms. Tindal's case.   This is demonstrated in her normal November 2001 MRI.

---

[5] Although Dr. Goll's examination occurred after Plaintiff's hearing, Plaintiff's record was supplemented with Dr. Goll's report and the ALJ discussed Dr. Goll's findings in her decision.

(Tr. 320).

In addition to noting Plaintiff's range of motion testing showed no deficits, Dr. Goll noted, "[t]he patient [Plaintiff] moves with great labor within the exam room, but when witnessed with distraction as she was coming into the clinic earlier today, she was walking normally without an assistive device."[6]  (Tr. 319; *see also* Tr. 315-16).  Dr. Goll further noted that Plaintiff had no surgical indications (Tr. 320).

On November 24, 2004, after considering the record evidence and the testimony, the ALJ determined at Step 5 of the sequential evaluation process that Plaintiff was not disabled because there were significant jobs in the local and national economy Plaintiff could perform despite her limitations.

## IV. Analysis

### A.      Whether the ALJ Erred in Finding Plaintiff was not Disabled Pursuant to 20 C.F.R. Pt. 404, Subpt. P., App. 1, Section 12.05C

Plaintiff's first argument is that the ALJ failed to adequately articulate her basis for not finding Plaintiff's sub-average intellectual functioning initially manifested during Plaintiff's developmental period pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.05C ("Listing 12.05C") (Doc. #12 at 1, 7-13).  The Court, however, finds this argument unpersuasive because the ALJ articulated several reasons for not finding Plaintiff's sub-average intellectual functioning initially manifested during Plaintiff's developmental period. Moreover, as discussed below, the Court finds the ALJ's articulated reasons are supported by substantial evidence of record.

---

[6] The Court notes that, although Plaintiff walks with a cane, the record shows Plaintiff has not been prescribed a cane (Tr. 375).

12

The introductory paragraph of 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period"–*i.e.* before age 22.  A claimant meets the criteria for presumptive disability under 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70, inclusive, and evidence of an additional mental or physical impairment that imposes an additional and significant work-related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.05C.  A low I.Q. score, however, is not conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record.  *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir.1986).

Plaintiff maintains that, under *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 1997), absent evidence of sudden trauma that can cause mental retardation, I.Q. scores are presumed to be stable and constant throughout a person's life (Doc. #12 at 9).  The presumption set fourth in *Hodges*, however, is a rebuttable presumption.  Specifically, as the Eleventh Circuit stated in *Grant v. Astrue*:

> In *Hodges*, we [the Eleventh Circuit] held that there is a rebuttable presumption that a claimant manifested deficits in adaptive functioning before the age of 22 if the claimant established a valid IQ score between 60-70. . . . [. . .]  We concluded [in *Hodges*] that, absent evidence of sudden trauma causing mental retardation, it was error for the ALJ not to recognize the presumption that the claimant manifested a mental impairment before the age of 22, and we remanded the case to allow the Commissioner to 'present evidence of Hodge's daily life to rebut this presumption of mental impairment.'

No. 07-12206, slip op. at *1 (11th Cir. Nov. 13, 2007)[7] (*quoting Hodges*, 276 F.3d at 1268-

---

[7] Unpublished opinions are not considered binding authority; however, they may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

69.  In *Hodges* (unlike in the case at bar), the record was "devoid" of any evidence related to the plaintiff's mental capabilities before the age of 22 and the evidence indicated the plaintiff could barely read from books and needed her daughter's assistance to write letters. *Hodges*, 276 F.3d at 1268.

Here, the ALJ presented evidence of Plaintiff's daily life and articulated her basis for not finding Plaintiff's sub-average intellectual functioning initially manifested during Plaintiff's developmental period.  The ALJ found the fact Plaintiff graduated high school through regular classes, had good reading skills (as found by Dr. Knox), maintained employment with steady income, and had past work experience as a cashier (which required the ability to be accurate and deal with money and the public) mitigated against a finding that Plaintiff had low intellectual functioning or deficits in adaptive functioning prior to age 22 (Tr. 25).

Plaintiff argues that the fact Plaintiff graduated high school through regular classes does not support the ALJ's finding that Plaintiff did not have impairments in adaptive functioning prior to age 22 (Doc. #12 at 11).  In support of this argument, Plaintiff cites *Winston v. Barnhart*, 421 F. Supp. 2d 1355, 1358-59 (N.D. Ala. 2006).  In *Winston*, however, although the plaintiff did not take special education classes, the plaintiff repeated the seventh grade once and repeated the eight grade twice, made many failing grades, and withdrew from school during the eleventh grade at age 20.  *Winston*, 421 F. Supp. 2d at 1359.  The *Winston* court found that the plaintiff's high school record supported his low I.Q. score.

14

The undersigned, however, finds *Winston* is factually distinguishable from the case at bar.  Here, there is no evidence Plaintiff repeated any grade levels or failed any classes. Moreover, Plaintiff did not drop out of high school–she graduated.  Additionally, the Court notes that Dr. Knox's overall impression of Plaintiff's mental limitations were  moderate, as represented by his assessed GAF score of 60 (Tr. 289), which is at the highest end of the 51-60 range.

Plaintiff also argues that the fact Plaintiff worked at Eckerd's for numerous years, primarily as a stock clerk, without ever advancing shows that her mental impairment was no different prior to age 22 (Doc. #12 at 12).  The Court, however, is not persuaded by this argument for the following reasons.

First, the Court finds it significant that Plaintiff was employed by the same employer for 16 years.  As the ALJ pointed out, this likely indicates that Plaintiff's services were worth what she was paid (Tr. 25).  Second, Plaintiff maintains that she was the "head stock clerk" and that she supervised two people below her, which would indicate some form of advancement (Tr. 121).  Third, the VE testified that Plaintiff's past jobs as stock clerk and cashier are both considered semi-skilled as defined by the DOT (Tr. 78, 370-71, 386). Indeed, the DOT describes the job duties of a retail order clerk, in pertinent part, as follows: "Inventories, stores, prices, and restocks merchandise in retail store. . . .  Requisitions merchandise from supplier based on available space, merchandise on hand, customer demand, or advertised specials."   1 United States Dep't of Labor, *Dictionary of Occupational Titles* § 299.367-014.  The Court finds the aforementioned job duties require a level of skill and cognitive ability that mitigate against a finding that Plaintiff's sub-average

intellectual functioning initially manifested during her developmental period.

Additionally, the Court finds the facts of this case are more similar to the facts in *Humphries v. Barnhart*, No. 05-17148, at *2 (11th Cir. June 8, 2006), in which, the Eleventh Circuit found substantial evidence supported the ALJ's determination that the claimant did not meet Listing 12.05(C) despite the fact that she had an I.Q. of 65. The *Humphries* court found the ALJ properly determined that the plaintiff did not have deficits of adaptive functioning that manifested during the developmental phase where she served as a manager of a cafeteria for almost 15 years, made lists of tasks, supervised five employees, and ordered groceries. *Id*.

Accordingly, and for the aforementioned reasons, the Court finds the ALJ's determination that Plaintiff's sub-average intellectual functioning did not initially manifest during Plaintiff's developmental period pursuant to Listing 12.05C is supported by substantial evidence of record and that the ALJ properly rebutted the presumption that Plaintiff's low I.Q. score would indicate her sub-average intellectual functioning initially manifested during her developmental period.

**B.    Whether the ALJ Failed to Properly Address Dr. Knox's Assessed Mental Limitations**

Plaintiff's next argument is that the ALJ erred when she failed to include in her RFC finding or in the hypothetical question posed to the VE Dr. Knox's assessment that Plaintiff has difficulty processing verbal information and that she loses information rapidly (Doc. #12 at 13-16). The Court, however, finds Plaintiff's argument lacks merit.

16

Specifically, the Court notes Dr. Knox completed an assessment form, wherein he indicated what effect Plaintiff's mental problems would have on her ability to work (Tr. 290-91).   In his assessment, Dr. Knox stated Plaintiff has no limitation in her ability to understand, remember, or carry out short simple instructions, and that Plaintiff has only a slight limitation (*i.e.* can generally function well) in her ability to understand, remember, or carry out detailed instructions and to make judgments on simple work-related decisions (Tr. 290-91).   Dr. Knox additionally stated Plaintiff has a moderate limitation (*i.e.* able to function satisfactorily) in her ability to interact appropriately with the public, supervisors and co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting (Tr. 290-91).

The Court finds the slight to moderate limitations assessed by Dr. Knox are consistent with Plaintiff's GAF score of 60.  Additionally, the Court notes the ALJ did, in fact, include the aforementioned limitations in her RFC finding and in the hypothetical question posed to the VE (Tr. 29, 290-91, 387).[8]  Accordingly, Plaintiff's argument that the ALJ did not fully consider Plaintiff's mental limitations, as assessed by Dr. Knox, fails.

**C.    Whether the ALJ Erred in Evaluating Plaintiff's Work-Related Limitations Resulting From Plaintiff's Diagnosis of Myofascial Pain Syndrome**

Plaintiff's next argument is that the ALJ erred by failing to credit Plaintiff's diagnosis of myofascial pain syndrom as an explanation for her lower back pain and that the ALJ

---

[8] Specifically, the ALJ asked the VE to assume the hypothetical individual "has moderate limitation interacting appropriately with the public, with supervisors, with coworkers.  She [hypothetical individual] has a moderate limitation of responding appropriately to work pressure and changes in work routine and I'm [the ALJ] going to define moderate as limited but satisfactory function.  She has a slight limitation on understanding and remembering detailed instructions, carrying out detailed instructions and making simple judgments and slight is general well functioning."  (Tr. 387).

additionally erred by relying on the lack of objective medical evidence to discredit Plaintiff's allegations of pain (Doc. #12 at 16-17).   The Court finds the foregoing arguments unpersuasive for the following reasons.

Contrary to Plaintiff's argument, the ALJ recognized Plaintiff has been diagnosed with myofascial pain syndrom and that Plaintiff has been treated for this condition (Tr. 26). Additionally, the ALJ found Plaintiff's back pain was considered "severe" under the Regulations (Tr. 29, Finding 3).   Although the ALJ found it appeared "obvious" Plaintiff experienced pain, the ALJ found Plaintiff's allegations regarding her pain symptoms and work-related limitations stemming from her alleged pain symptoms were neither credible, nor supported by the objective medical evidence (Tr. 25).

The Eleventh Circuit pain standard requires evidence of an underlying medical condition, and either objective medical evidence that confirms the severity of the alleged pain arising from that condition, or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986). "After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) (*citing Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)); *see also Cartwright v. Heckler*, 735 F.2d 1289, 1290 (11th Cir. 1984) (finding the credibility of a claimant's testimony is the duty of the Commissioner).

Additionally, the Regulations state that when the medical signs or laboratory findings document a medically determinable impairment that could reasonably be expected to

produce the pain alleged, the Commissioner must then evaluate the intensity and persistence of the pain to determine how it limits the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c); 416.929(c). In evaluating the intensity and persistence of a claimant's pain, the ALJ shall consider all of the available evidence, including the claimant's statements, signs and laboratory findings, and statements from treating and non-treating sources. 20 C.F.R. §§ 404.1529(c); 416.929(c).

Here, although the ALJ acknowledged Plaintiff had been treated for myofascial pain syndrom, the ALJ determined from all of the available evidence that Plaintiff's allegations of pain were simply not credible. In support of the aforementioned determination, the ALJ cited numerous reasons that the Court finds are supported by substantial evidence of record.

First, the ALJ noted that, although Plaintiff has received epidural steroid injections, her back impairment is not amenable to surgery and she has mainly received conservative or routine treatment (Tr. 26). The Court finds that these findings are consistent with the medical evidence of record, *supra*. Second, the ALJ noted that the results of Plaintiff's x-rays and MRIs were essentially normal (Tr. 26). The Court finds this finding is consistent with the record evidence, *supra*.

Third, the ALJ noted that no treating or examining physician has ever stated that Plaintiff is completely unable to work, and that Dr. McCormick's examination indicated no limitations in Plaintiff's functional ability (Tr. 26). The ALJ further noted that Dr. Ero encouraged Plaintiff to exercise and Dr. Goll stated Plaintiff had no deficits in her range of motion, motor, or sensory testing (Tr. 26). Lastly, the ALJ mentioned that, although Plaintiff

19

used a cane, no doctor has said it is medically necessary, nor has a cane been prescribed to Plaintiff (Tr. 26; *see also* Tr. 375).  Furthermore, the ALJ points out that serious issues have been raised about Plaintiff's credibility because, as Dr. Goll observed, Plaintiff "move[d] with great labor within the exam room, but when witnessed with distraction as she was coming into the clinic earlier today, she was walking normally without an assistive device."  (Tr. 319).

Accordingly, and for the aforementioned reasons, the Court finds the ALJ's articulated reasons for discounting Plaintiff's allegations that her pain prevents her from being gainfully employed are supported by substantial evidence of record.

**D.    Whether the Court Should Direct the Appeals Counsel to Reevaluate Plaintiff's Request to Reopen her February 26, 2001 Termination of Benefits and/or Whether  Plaintiff has Established Good Cause for the Court to Allow Plaintiff an Extension of Time to Appeal her February 26, 2001 Notice of Termination**

Plaintiff asks this Court order the Commissioner to reevaluate Plaintiff's request to reopen her February 26, 2001 termination of benefits because, based on the evidence of record concerning her poor understanding of written instructions and other cognitive limitations, Plaintiff has established a colorable constitutional claim, and therefore, the Court has jurisdiction to grant the requested relief (Doc. #12 at17-20).  The Court disagrees with Plaintiff's assertions, however, and denies Plaintiff's request for the following reasons.

The Commissioner's denial of Plaintiff's request to reopen her prior claim is not subject to judicial review.  20 C.F.R. §§ 404.903(l); 416.1403(a)(5).  The Eleventh Circuit has held that a district court does not have jurisdiction to review the Commissioner's discretionary denial of a request to reopen a prior final determination, absent a colorable

constitutional claim, such as a violation of due process. *Loudermilk v. Barnhart*, 290 F.3d 1265, 1268 (11th Cir. 2002).

Here, the Court does not find Plaintiff's borderline I.Q. and other mental problems rise to the level of a colorable constitutional claim because Plaintiff has not demonstrated, and the record does not support, that Plaintiff was mentally incapable of understanding and pursuing her administrative remedies in regards to her February 26, 2001 termination of benefits notice.

As Dr. Knox noted, Plaintiff's achievement testing showed good reading skills (Tr. 289).  Furthermore, in a handwritten letter, Plaintiff herself indicated that she merely "misread" the notice and missed her appeal rights (*see* Tr. 82).  Plaintiff never said in her logical and coherent letter that she was incapable of comprehending the termination letter and/or the appeals process (*see* Tr. 82).

As an alternative grounds for relief, Plaintiff points to Social Security Ruling (SSR) 91-5p and alleges she has met the good cause requirement to allow her an extension of time to appeal her February 26, 2001 termination of benefits.  SSR 91-5p states in pertinent part:

> In determining whether a claimant lacked the mental capacity to understand the procedures for requesting review, the adjudicator must consider the following factors as they existed at the time of the prior administrative action: (1) inability to read or write; (2) lack of facility with the English language; (3) limited education; and (4) any mental or physical condition which limits the claimant's ability to do things for him/herself.

SSR 96-8p, 1991 WL 208067, at *2 (S.S.A. July 1, 1991).

As noted throughout this opinion, the evidence of record does not establish that Plaintiff meets any of these four factors. Plaintiff has good reading and writing skills, she is proficient with the English language, she graduated high school through regular classes, she has past work experience in semi-skilled occupations, and, although Plaintiff testified otherwise, the medical evidence does not support Plaintiff's contention that she has a physical condition that limits her ability to do things for herself.

Accordingly, the Court does not find Plaintiff has established good cause to justify granting her an extension to appeal here February 26, 2001 termination of benefits determination.

## V. Conclusion

Review of the record as a whole reveals substantial evidence supports the ALJ's finding of non-disability. Additionally, the evidence of record does not establish that Plaintiff has raised a colorable constitutional claim that would give the Court jurisdiction to order the Commissioner to reevaluate Plaintiff's request to reopen her February 26, 2001 termination of benefits. Furthermore, the evidence does not support Plaintiff's contention that she has established good cause for not appealing the February 26, 2001 termination decision based on her borderline I.Q. and other cognitive limitations.

Accordingly, and for the reasons stated herein, the Commissioner's decision is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

22

**DONE AND ORDERED** at Jacksonville, Florida this 17th day of March, 2008.

Copies to all counsel of record
  and *pro se* parties, if any

*Thomas E. Morris*

**THOMAS E. MORRIS**
United States Magistrate Judge